Anne M. LOGUE, Plaintiff–Appellee,

v.

INTERNATIONAL REHABILITATION ASSOCIATES, INC., et al., Defendants–Appellants.

No. 87–3156.

United States Court of Appeals, Third Circuit.

Argued Oct. 6, 1987.

Decided Jan. 20, 1988.

Francis M. Milone (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., for defendants-appellants.

David B. Mulvihill (argued), Mansmann, Cindrich & Titus, Pittsburgh, Pa., for plaintiff-appellee.

Before BECKER, SCIRICA and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This is an appeal in a suit alleging sex discrimination. Appellant International Rehabilitation Associates ("IRA" or "the company") appeals from the judgment granted in favor of one of its former employees, appellee Anne M. Logue ("Logue"), in a suit alleging employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982) ("Title VII"). IRA maintains that the district court misapplied the legal standard under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Specifically, IRA argues that the court failed to consider evidence presented by IRA to rebut Logue's prima facie case of discrimination. We conclude that the district court misapplied the standard governing sex discrimination. We will vacate the district court's judgment and remand for further proceedings consistent with this opinion.

## I. *Background*

IRA is a rehabilitation service company, retained primarily by insurance carriers and self-insured employers to provide vocational and physical rehabilitation services to disabled persons.[1] Although IRA markets its services nationally, the events leading to this litigation occurred within the company's central region, which covers the eastern part of the United States from New York to Virginia. The central region contains several districts, each headed by a district office. Within each district are a number of branch offices. Each branch manager supervises various kinds of employees, including account representatives, rehabilitation supervisors, and vocational and rehabilitation specialists. Account representatives are responsible for marketing IRA's services to existing and potential customers. Vocational and rehabilitation specialists, who provide the actual services to the injured person, report to a rehabilitation supervisor.

IRA hired Logue in January, 1978, as a vocational specialist in its Pittsburgh district office. At that time, the Pittsburgh office handled the marketing and servicing for the state of Ohio. Within five months Logue was promoted to rehabilitation supervisor, a position which required her to supervise a number of vocational specialists who serviced the state of Ohio. In June, 1980, she was promoted to account representative and became responsible for marketing IRA's services in Ohio. Her immediate supervisor was Sharon Mains, who at the time was the Pittsburgh district manager.

In 1981, IRA decided to open a branch office in Columbus, Ohio, to service the entire state of Ohio. Mains selected Logue to open that office and act as its branch manager. After the Columbus office began operation in October, 1981, Logue not only performed her supervisory duties as branch manager, but also marketed IRA's services in Ohio, until Stewart Cohen, a vocational specialist, became account representative for the northern half of the state.

---

1. IRA does business under the trade name of "INTRACORP." The two names refer to the same entity. The company is a wholly owned subsidiary of CIGNA Corporation.

Logue remained responsible for marketing the southern half of Ohio until June, 1982, when she promoted Kenneth Ross, another vocational specialist, to the position of account representative for that area.

Mains resigned from IRA in May, 1982. The following September, Lawrence Rozanski became the new district manager in Pittsburgh. In early 1983, he and Leo Hamilton, Vice President for the central region, decided to open an additional office in Cleveland. Stuart Cohen was chosen to be the branch manager for this new office, and Ross was selected to replace Logue in Columbus. IRA discharged Logue in March, 1983.

On December 23, 1985, Logue filed suit,[2] claiming that IRA terminated her employment because of her sex, in violation of Title VII. The district court conducted a nonjury trial that lasted three days. At the trial, Logue testified that although she was qualified for her position, IRA replaced her with a less experienced male employee, Kenneth Ross. To counter Logue's claim, IRA offered evidence (1) that it established a new management structure for Ohio which altered the nature of the position of branch manager and led to the elimination of one management position; (2) that IRA selected Ross over Logue because Ross' abilities as a marketing representative were considered outstanding; and (3) that Logue refused IRA's offer of a new job in Cincinnati and resigned from IRA.

At the conclusion of the trial, the district court found that Logue had presented a prima facie case of discrimination.[3] Appendix ("App.") at 472. The court then evaluated what it perceived to be IRA's proffered reasons for terminating Logue: (1)

she resigned; (2) she refused the offer of a new position with IRA in Cincinnati; and (3) her performance was inadequate. *Id.* at 472–73. The court concluded that these explanations were pretextual. First, the court pointed out that the record contained no evidence that Logue had resigned. *Id.* at 472.[4] With respect to the alleged job offer in Cincinnati, the court found that no such position even existed until two years after Logue had left IRA. *Id.* at 472–73. Finally, the court rejected the claim that Logue's performance had been inadequate, finding not only that IRA's statistics were "confusing" and contradictory, but also that they failed to account for the fact that Logue had been given a tremendous amount of responsibility when she became branch manager in Ohio. *Id.* at 473–75. Based on these findings, the court decided that Logue's discharge resulted from sex-based discrimination. *Id.* at 476. On February 4, 1987, the district court entered final judgment in favor of Logue, awarding her reinstatement and back pay. This appeal followed.

## II. *Governing Law*

In determining whether the district court misapplied the legal standard governing sex discrimination, we exercise plenary review. *See United States v. Adams,* 759 F.2d 1099, 1106 (3d Cir.), *cert. denied,* 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *Gaines v. Amalgamated Ins. Fund,* 753 F.2d 288, 289–90 (3d Cir.1985).

In order to prove sex discrimination under Title VII, the plaintiff must show that her status as a minority class was a determinative factor in the employment decision. *See Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095; *Bellissimo v. Westinghouse Elec.*

---

**2.** The Complaint originally named IRA, INTRACORP, and CIGNA Corporation as defendants. With district court approval, the parties stipulated to a dismissal of all claims against CIGNA Corporation without prejudice. App. at 14–15.

**3.** A plaintiff may establish a prima facie case of discrimination by proving that the employee (1) belongs to a protected class; (2) was qualified for the position; (3) was dismissed despite being qualified; and (4) was ultimately replaced by someone of the same qualifications. *See*

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Jackson v. University of Pittsburgh,* 826 F.2d 230, 233 (3d Cir.1987); *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 202 (3d Cir.1987); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.), *cert. dismissed,* — U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

**4.** IRA's own records show that the company terminated Logue. App. at 603.

*Corp.*, 764 F.2d 175, 179 & n. 1 (3d Cir. 1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986); *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1395 (3d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 582, 83 L.Ed.2d 702 (1984). The method of proof in Title VII cases is well settled. First, the plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093; *Bellissimo*, 764 F.2d at 179. After the plaintiff has established a prima facie case, the burden shifts to the defendant to produce evidence of a "legitimate, nondiscriminatory reason for the employee's rejection." *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093; *Bellissimo*, 764 F.2d at 179. Once the defendant's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95; *Bellissimo*, 764 F.2d at 179; *Robinson*, 771 F.2d at 777 n. 13. At this point the plaintiff, who retains the ultimate burden of persuasion, must prove by a preponderance of the evidence that the defendant's proffered reasons were merely a pretext for discrimination. *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1095; *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 898 (3d Cir.), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987); *Robinson*, 771 F.2d at 777 n. 13; *Bellissimo*, 764 F.2d at 180 (3d Cir.1985). The plaintiff may refute the employer's explanation through either direct or indirect proof. *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1095. Specific evidence showing that the employer's proffered reason is unworthy of credence would suffice to meet the plaintiff's burden. *See Sorba v. Pennsylvania Drilling Co.*, 821 F.2d 200, 202 (3d Cir.1987); *Chipollini*, 814 F.2d at 900.

## III. *Discussion*

■ The district court's finding that Logue established a prima facie case of sex discrimination is not an issue in this appeal. IRA, however, contends that the court incorrectly applied the legal standard governing sex discrimination. Specifically, IRA argues that the district court erred in failing to address the legitimate, nondiscrimi-

natory reasons offered by IRA for the termination of Logue. We agree. The court failed to address and make appropriate findings of fact and conclusions of law with respect to two specific nondiscriminatory business reasons articulated by IRA: the restructuring of management for the state of Ohio and the superior qualifications of Ross for the newly structured position of branch manager at Columbus. For this reason, we decline to review the other findings and conclusions in the bench opinion.

The record contains ample evidence that IRA substantially changed its management structure in Ohio. Before IRA's reorganization, the Columbus branch manager primarily supervised cases throughout the entire state, while two account representatives conducted the marketing of IRA's services. App. at 183–85, 637. After the restructuring, IRA had branch managers in Columbus and Cleveland; and each was responsible both for marketing and for case supervision in his respective geographical area. *Id.* at 637. The company therefore eliminated the account representative positions. *Id.* The testimony of Logue and Hamilton indicates that IRA had previously experimented with this management structure in other cities in the central region, including Baltimore. *Id.* at 183–84, 425–26. Hamilton testified that the advantage of this new management structure was a higher level of efficiency. Before reorganization, a customer directed a complaint to an account representative, who reported to the supervisor. The supervisor then brought the complaint to the attention of a rehabilitation specialist. After reorganization, however, the same person was responsible both for sales and for the delivery of services. *Id.* at 183–84. Moreover, according to Rozanski's testimony, the primary goal of opening an additional office in Ohio was to attract new business, which ultimately would increase the company's profitability. *Id.* at 258–59. IRA presented this evidence to support its position that Logue's termination "was based upon economics and the perception that an established marketing individual would best serve the needs of the reorganized Colum-

bus office." *Id.* at 636 (memo to personnel files).

■ The district court failed to consider this reason for Logue's termination. The bench opinion made no reference to IRA's proffered evidence of management restructuring. In fact, when IRA argued at trial that the restructuring of management for the state of Ohio changed the branch manager's duties, the court questioned the legitimacy of the company's entire business, *id.* at 439; such questioning, however, cannot substitute for evaluation of the proffered justifications. Moreover, the court mentioned no evidence that would indicate that the reorganization served merely as a pretext for discrimination against Logue.

■ IRA also presented evidence that Ross' marketing ability was superior to that of Logue. IRA's evaluation system included five categories: (1) substantially attains expectations, (2) exceeds expectations, (3) attains expectations, (4) almost exceeds expectations, and (5) fails to attain expectations. As an account representative, Ross had received two outstanding evaluations from Logue. She rated him "exceeds expectations [plus]" and "substantially exceeds expectations," the two highest ratings an IRA employee can receive. *Id.* at 660, 665. Logue herself testified that very few people received ratings higher than "attains expectations." *Id.* at 155. In addition, Ross received the account representative of the month award in June, July, August, September, and November, 1982, and again in January and February, 1983. *Id.* at 642–49. IRA also named him account representative of the year for 1982. *Id.* at 185. In a letter of recommendation dated March 14, 1983, Logue praised Ross: "Ken is unique in his ability to forecast problems and plot strategies to avoid them. In addition, his skills in management, case supervision, and customer relations are outstanding.... I would recommend him for any position he felt capable of handling." *Id.* at 653.

Although the ratings of Logue did not reflect inadequate performance, they were not so favorable as the outstanding evaluations of Ross. As a vocational specialist in 1979, Logue had received a rating of "exceeds expectations." App. 479. When she subsequently worked as rehabilitation specialist and account representative, however, she was rated "attains expectations." *Id.* at 480–481. Mains also rated her at that level in May, 1982, while she was Columbus branch manager. *Id.* at 365.

The record does establish that Logue had more education and more experience with IRA than Ross. Logue had a master's degree, had worked for IRA for more than five years, and had two and one-half years of marketing experience. On the other hand, Ross had only a bachelor's degree, had been with IRA for thirteen months, and had only nine months of marketing experience. *Id.* at 305–07. Rozanski, however, testified that education and length of service were not important considerations in the decision to select Ross over Logue; rather, sales ability was the determinative factor. *Id.* 311–12. Both Hamilton and Rozanski also stressed that because Ross already had extensive marketing contacts, they felt he was better able to maintain and attract a client base. *Id.* at 185, 263–64. At the time IRA opened its Cleveland office, Logue had not been involved in marketing for several months. IRA presented evidence of Ross' superior marketing skills in order to rebut Logue's prima facie case of sex discrimination.

Again, the district court failed to address this proffered business reason for the termination of Logue. The court merely found that Ross had less experience with IRA than Logue. *Id.* at 474. Indeed, the court made only a single reference to Ross' marketing ability: "Another person, a male, was put into that job at a higher salary than [Logue] got. We recognize the company said, well, he had to get that because he was making so much on commissions." *Id.* at 475.

In failing to address IRA's proffered reasons, the district court never considered whether these explanations were pretextual. This error deprived IRA of the full trial process contemplated in *Burdine*. In effect, the district court entered judgment in favor of Logue based on the strength of

her prima facie case. *See Clemente v. United States,* 766 F.2d 1358, 1366 (9th Cir.1985).

The district court did stress that it doubted the credibility of several of IRA's witnesses. Specifically, the court found that Hamilton was evasive on the witness stand and suffered an unexplained memory lapse. *Id.* at 475. The court also noted that Rozanski's testimony contradicted that of another witness and that Rozanski, as the person who terminated Logue, had a motive for concealing a discriminatory discharge. *Id.* at 475–76. The court rejected IRA's contention that Logue refused a job offer in Cincinnati, but then concluded that because this explanation was pretextual, it cast doubt on the validity of other proffered business reasons. *Id.* at 475. In effect, the court rejected several of IRA's articulated business reasons without considering them.

 In rejecting those business reasons, the court misapplied the legal standard governing sex discrimination. We recognize that a plaintiff may establish pretext simply by showing that the defendant's articulated reason is unworthy of credence. *Chipollini,* 814 F.2d at 900. Moreover, the fact finder, in this case the trial judge, has the discretion to evaluate the credibility of witnesses, and this determination is given great weight. But before the court can reject all the employer's explanations as pretextual, it must first address the specific proffered business reasons. In addition, if an employer articulates several alternative and independent legitimate, nondiscriminatory reasons, the falsity of one does not necessarily justify finding the remaining articulated reasons pretextual. *See Sims v. Cleland,* 813 F.2d 790, 793 (6th Cir.1987).[5]

We conclude that the district court erred in failing to consider all of IRA's proffered evidence of legitimate business reasons for Logue's termination and to make specific findings of fact and conclusions of law in connection therewith. Accordingly, we will vacate the judgment of the district court and remand for appropriate findings of fact and conclusions of law in light of this opinion.[6]

---

**5.** We note that Logue proffered credible evidence that IRA had treated her shabbily, and that some of the reasons IRA offered for not retaining Logue were clearly pretextual. Nevertheless, we emphasize that we must restrict our inquiry to the question of discrimination because of sex; and as sympathetically as we view Logue's situation, our task is not to assess the overall fairness of her former employer's actions. The district court rightfully concluded that some of IRA's reasons for firing Logue were beyond credence, and that IRA did not treat Logue fairly in light of her service to the company. It is therefore understandable that the court was suspicious of IRA's motives. Nevertheless, we hold that the district court was required to consider and discuss all non-discriminatory reasons offered by IRA.

**6.** Our remand makes it unnecessary to reach IRA's contentions that (1) the conclusion that IRA's articulated reason for the selection of Ross over Logue was a pretext for discrimination is clearly erroneous; (2) to the extent the district court made findings of fact concerning Logue's job performance, those findings are clearly erroneous; (3) the district court erred as a matter of law in considering evidence of the Cincinnati job offer on the issue of pretext; and (4) the district court failed to comply with Fed. R.Civ.P. 52(a).

However, we find that the district court erred in entering judgment against CIGNA corporation. App. at 761. In light of the Stipulation to dismiss all claims against CIGNA, *see supra* note 2, we vacate that aspect of the district court's judgment.