NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-1729

_____

ROBERT BALL, Dr.,

Appellant

v.

EINSTEIN COMMUNITY HEALTH ASSOCIATES, INC.;
STEVEN SIVAK, M.D., Medical Director, ECHA, Inc.;
LUANN TRAINER, Executive Director, ECHA, Inc.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 10-cv-2474)
District Judge:  Hon. J. Curtis Joyner

_____

Submitted Under Third Circuit LAR 34.1(a)
January 10, 2013

Before:  RENDELL, FISHER, and JORDAN, *Circuit Judges*.

(Filed: February 14, 2013)

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

Appellant Robert Ball appeals an order granting summary judgment to Einstein

Community Health Associates, Inc. ("ECHA"), Steven Sivak, and Luann Trainer on

Ball's claims of age and disability discrimination. For the following reasons, we will affirm.

## I. Background

Ball is a primary care physician who maintained a private medical practice in North Philadelphia from 1966 to 1998. In November 1998, when he was 63 years old, Ball sold his practice to ECHA, a corporation that operates medical practices and employs physicians in the greater Philadelphia area. He then worked for ECHA, pursuant to one- or two-year contract terms, until ECHA declined to renew his employment contract in 2009.

Ball's first dispute with ECHA occurred in 2004, when the company's former medical director notified Ball that his contract would not be renewed due to his alleged low work productivity. Ball did not assert age or disability discrimination at that time, but he nonetheless protested the nonrenewal to a board member of ECHA's parent company, which resulted in a 90-day extension of his employment contract. During that temporary extension, Dr. Steven Sivak became ECHA's Medical Director, and he decided to renew Ball's contract. Around that same time, Ball developed Chronic Inflammatory Demyelinating Polyneuropathy ("CIDP"), a disabling condition of the nervous system that significantly limited his physical mobility, but did not affect his ability to perform the essential functions of his job as a physician.

In 2008, Sivak and Luann Trainer, ECHA's Vice President for Physician Services, began to investigate several aspects of Ball's job performance. After auditing Ball's patient files, they determined that Ball had included insufficient clinical documentation in

his patient progress notes to support the proper billing codes.[1]  To address that concern, ECHA provided Ball with training sessions on billing and coding in February, March, May, and August 2008.  Ball, however, still failed his May, September, and November 2008 billing and coding audits.  ECHA also reviewed Ball's recent narcotics prescription history, after receiving complaints that his drug-seeking patients were aggressively demanding narcotic prescription refills and disrupting the office.  That investigation revealed that, although narcotics prescriptions by other physicians accounted for between 10.92% and 19.57% of total prescriptions, 34.05% of Ball's total prescriptions were for narcotics.  Furthermore, ECHA's prescription records appeared to show that Ball sometimes wrote duplicate narcotics prescriptions for his patients.  Finally, Sivak and Trainer examined whether Ball was properly following ECHA's Pain Management Policy, which requires doctors to refer drug-seeking patients to a pain management specialist and to refuse narcotics prescriptions to patients who do not adhere to the referral.  They concluded that he was not following that policy.[2]

---

[1] Private health insurers, Medicare, and Medicaid use a standardized system for reimbursement that requires that physicians record five digit billing codes in their patient progress notes and other medical records.  Those codes correspond to "Relative Value Units" ("RVUs"), which "attempt to account for the work performed by a physician, the physician's training and expertise, the type of equipment used and the professional liability insurance required to perform a particular coded service.  Insurers, including Medicare, assign a physician fee schedule based on a dollar-amount multiplier per approved RVU." *Hill v. Gozani*, 638 F.3d 40, 47 (1st Cir. 2011).  Physicians at ECHA are required to enter the proper codes to receive compensation.  "Failure to do so can result not only in under- or over-payments, but in extreme cases to civil and criminal liability for fraud."  (App. at 116).

[2] Ball contests the basis for that conclusion and produced evidence showing that he had generally complied with the Pain Management Policy.

On November 11, 2008, Sivak gave Ball notice that ECHA would not renew his contract under its current terms and conditions when it expired in February 2009.[3] At the end of the year, Trainer and Sivak met with Ball and informed him that his contract would not be renewed at all. They explained to Ball that "ECHA has … determined that offering you a new contract does not fit into its strategic plans," and thus that his employment with ECHA would cease on February 28, 2009, when his contract expired. (App. at 42-43.) At that point, Ball was 73 years old, and he still suffered from CIDP.

Ball subsequently filed this lawsuit against ECHA, Sivak, and Trainer (collectively, "Appellees"). He alleged that Appellees declined to renew his contract because of his age and his disability, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111-17, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§ 951-63. After discovery, Appellees filed a motion for summary judgment, which the District Court granted as to all of Ball's claims. Applying the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[4] the Court concluded that Appellees had established legitimate nondiscriminatory

---

[3] The terms of Ball's employment contract required that he be given 90 days' written notice that his contract would not be renewed.

[4] Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of employment discrimination. *Maynard v. Rivera*, 675 F.3d 225, 229 (3d Cir. 2012). Then, the employer "bears the burden of production to articulate some legitimate, statutorily-approved reason for the plaintiff's discharge." *Id.* (internal quotation marks omitted). Finally, if that burden is met, the burden of production "shifts back to the plaintiff to show, by a preponderance of the evidence, that the proffered reason is pretextual." *Id.* (internal quotation marks omitted).

reasons for their decision not to renew Ball's contract, and that Ball had failed to demonstrate that Appellees' proffered reasons were pretextual.[5]

Ball then filed this timely appeal.

## II.    Discussion[6]

The parties do not dispute the District Court's conclusion that Ball "has established a prima facie case of age and disability discrimination," or that Appellees have met their burden of producing evidence of legitimate nondiscriminatory reasons for their employment decision.  (App. at 15.)  At issue on appeal is whether Ball established a genuine issue of material fact regarding whether Appellees' proffered reasons are merely pretexts for impermissible discrimination on the basis of age or disability.

---

[5] Ball's ADEA, ADA, and PHRA claims are all governed by the *McDonnell Douglas* framework.  *Tomasso v. Boeing Co.*, 445 F.3d 702, 704 (3d Cir. 2006) (concluding that ADEA and PHRA claims are both governed by *McDonnell Douglas*); *Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 759 (3d Cir. 2004) (applying that framework to an ADA claim).

[6] The District Court had subject matter jurisdiction over the ADEA and ADA claims pursuant to 28 U.S.C § 1331, and over the PHRA claim pursuant to 28 U.S.C § 1367.  We have jurisdiction over the appeal under 28 U.S.C § 1291.  The District Court's grant of summary judgment is subject to plenary review.  *Carrasca v. Pomeroy*, 313 F.3d 828, 832-33 (3d Cir. 2002).  "Summary judgment is appropriate where the court is satisfied 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (quoting Fed. R. Civ. P. 56(c)).  When the moving party "does not bear the burden of persuasion at trial," however, it "may meet its burden on summary judgment by showing that the nonmoving party's … evidence is insufficient to carry its burden of persuasion at trial."  *Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir. 1995).  The "mere existence of *some* alleged factual dispute … will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In reviewing the record, we must construe all reasonable inferences in the light most favorable to the nonmoving party.  *See id.* at 255; *Sempier*, 45 F.3d at 727-28.

5

To demonstrate pretext under the summary judgment standard, a plaintiff must either (1) offer evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication," or (2) present evidence sufficient to support an inference that "discrimination was more likely than not a … determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994). To meet that burden, a plaintiff "cannot simply show that the employer's decision was wrong or mistaken." *Id.* at 765. The fact that an employer made a poor or unwise decision does not make that decision discriminatory. *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason."). Evidence undermining an employer's proffered legitimate reasons therefore must be sufficient to "support an inference that the employer did not act for its stated reasons." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995). A non-moving plaintiff can meet that burden at the summary judgment stage by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,'" and thus infer that nondiscriminatory reasons were not the cause for the adverse employment action. *Fuentes*, 32 F.3d at 765.

Appellees provide three nondiscriminatory reasons for their decision not to renew Ball's employment. First, Ball repeatedly failed billing and coding audits, even after multiple training opportunities. Second, Ball prescribed narcotics at about twice the rate

of the other physicians in his office, and he appeared to have sometimes written duplicate narcotics prescriptions for the same patients on the same day. Third, Ball violated ECHA's Pain Management Policy by failing to refer drug-seeking patients to a pain management specialist. Appellees claim that each of those specific reasons is demonstrative of their overall motivation for not renewing Ball's contract: he did not "represent[] the kind of physician that [they] would like to see within Einstein Community Health Associates." (App. at 125.)

In reviewing the District Court's grant of summary judgment, we must "look carefully at each of [the employer's] proffered reasons as well as [plaintiff's] claim of pretext regarding each of these reasons." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005). If Ball's evidence rebutting Appellees' proffered legitimate reasons permits a factfinder to conclude that each of those reasons was either a "*post hoc* fabrication" or otherwise did not actually prompt the employment action, then summary judgment was inappropriate.[7] *Fuentes*, 32 F.3d at 764 (citation omitted).

---

[7] We acknowledged in *Fuentes* that in some circumstances a plaintiff does not have to rebut *every* proffered reason in order to survive summary judgment. First, as described above, a plaintiff can meet his burden by presenting enough evidence of discrimination to support an inference that, despite the proffered legitimate reasons, the employment decision was in fact discriminatory. *Fuentes*, 32 F.3d at 762. Second, when a defendant presents "a bagful of legitimate reasons," many of which the plaintiff successfully rebuts, "the plaintiff may not need to discredit the remainder" if the defendant's credibility has been so seriously undermined "that a factfinder may rationally disbelieve the remaining proffered reasons" without any evidence specifically discrediting them. *Id.* at 764 n.7. As we discuss *infra* in Part III.C, those situations do not apply here.

A.     *Failure to Pass Billing and Coding Audits*

Appellees claim that one reason they declined to renew Ball's contract is that "he was not meeting ECHA's billing, coding and medical recordkeeping standards." (Appellees' Br. at 11.)  Ball does not dispute that he failed the May, September, and November 2008 billing and coding audits, but instead argues that other physicians who failed the audits were treated differently by ECHA.  In particular, he alleges that four younger, nondisabled doctors also failed billing and coding audits, yet were given different training than he received and remained employed.  According to Ball, that difference in treatment demonstrates that his audit failures are a mere pretext for what was actually a discriminatory decision to end his employment.

We disagree, because the evidence simply does not support Ball's contention that he was treated differently than similarly situated younger or nondisabled physicians.  Ball presents no evidence that the training he received was substantively different from that received by other physicians who also failed audits.  The evidence in the record shows that he received at least four training opportunities on billing and coding in 2008, including two one-on-one training sessions.  Ball does not contest that fact, nor does he argue that other doctors received more or better training than he did.  Rather, he claims only that some doctors received training from a different person, without providing any evidence that the training he received was in any way deficient or inferior.

More importantly, Ball concedes that he is the only physician who never managed to pass a coding audit.  He therefore can point to no similarly situated physician who retained a job at ECHA, because there are no physicians in analogous circumstances.  As

8

Ball does not dispute, "[t]he maintenance of adequate medical records is a fundamental professional … responsibility of a treating physician." (Appellees' Br. at 7.) Ball has not presented sufficient evidence for a reasonable factfinder to infer that ECHA's concern about his repeated record-keeping failures was either an after-the-fact excuse or otherwise did not actually prompt the employment action. *Fuentes*, 32 F.3d at 764. On the contrary, ECHA's persistent efforts to improve Ball's coding and billing practices suggest that his continued inability to pass an audit was exactly what Appellees claim: a legitimate, nondiscriminatory explanation for why his contract was not renewed.

B.     *Inappropriate Narcotics Prescribing Practices*

Appellees' second proffered reason for not renewing Ball's contract is that he overprescribed narcotics to his patients.[8] Ball argues that he has factually rebutted that claim, and that he has produced evidence that he was singled out for particular scrutiny with regard to his prescribing practices. Specifically, Ball notes that ECHA ran a prescription record report "for no other ECHA physician," which he claims "provides clear evidence of disparate treatment." (Appellant's Opening Br. at 33-34.)

Ball makes no mention, however, of Appellees' explanation for why he was singled out: that disruptions caused by his drug-seeking patients raised Appellees'

---

[8] We consider the second reason, even though the first reason alone would generally be fatal to a plaintiff's claim, because Ball argues that weaknesses in the other proffered reasons for his termination undermine Appellees' credibility as a whole, such that a rational factfinder could reject all of their proffered reasons as pretextual. *See Fuentes*, 32 F.3d at 764 n.7 (concluding that in some instances "rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons").

concerns and triggered an investigation into his prescription records. Ball does not dispute that his patients caused disruptions, nor does he suggest that other physicians' patients caused similar disruptions. Moreover, he admits that his rate of prescribing narcotics seemed higher than normal, that he did in fact produce duplicate narcotics prescriptions for patients, and that providing multiple narcotic prescriptions to a patient would be "a matter of concern to ECHA." (App. at 142.) Even if a factfinder credited all of Ball's innocent explanations for that seemingly-incriminating data,[9] those explanations would, at best, suggest "that the employer's decision was wrong or mistaken," *Fuentes*, 32 F.3d at 765, not that ECHA fabricated its concern, *id.* at 764. Merely showing that Appellees may have been unwise to not renew his contract does not "support an inference that [they] did not act for [their] stated reasons." *Sempier*, 45 F.3d at 731. Accordingly, Ball has failed to produce evidence that "casts sufficient doubt" upon Appellees' proffered reason to establish that it was pretextual. *Fuentes*, 32 F.3d at 762.

C.    *Failure to Follow Pain Management Policy*

Appellees' final reason for not renewing Ball's contract is that he failed to follow ECHA's Pain Management Policy, which required, among other things, that drug-seeking patients be denied narcotics prescriptions if they failed to visit a pain management specialist. Ball argues that he was singled out for scrutiny regarding his adherence to the policy, and that he was in full compliance with it. Appellees respond that, as with the

_____

[9] Ball claims that the duplicate prescriptions were created when he made errors entering a prescription and had to generate a new one. He argues that his high rate of prescribing narcotics correlates to the high number of narcotics-using patients that he was assigned.

10

investigation into his prescribing practices, Ball was singled out, but for good reason: only his narcotics-seeking patients were causing disruptions at the medical clinic. Ball does not contest that fact, but he maintains that his production of evidence demonstrating his substantial compliance with the policy calls into question Appellees' overall credibility, such that a reasonable juror could find each of the Appellees' legitimate nondiscriminatory reasons to be pretextual.

At best, Ball may have produced sufficient evidence to create a factual dispute as to whether he complied with the Pain Management Policy. Although Appellees maintain that he continued to prescribe narcotics to patients who did not attend the required pain management appointments, Ball disagrees, and he points to many instances in which he did comply with ECHA's Policy. Ball has not, however, "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in that explanation for ECHA's decision not to renew his contract that a reasonable factfinder could find it "unworthy of credence." *Fuentes*, F.3d at 765 (internal quotation marks omitted). As already noted, showing that an employment decision was simply "wrong or mistaken" is insufficient to demonstrate pretext, and such evidence thus does not help Ball to survive summary judgment. *Id.*

Moreover, even assuming that Ball had cast sufficient doubt upon that alleged reason for the employment decision, we have held that "the falsity of one does not necessarily justify finding the remaining articulated reasons pretextual." *Logue v. Int'l Rehab. Assocs., Inc.*, 837 F.2d 150, 155 (3d Cir. 1988). As we made clear in *Fuentes*, to avoid summary judgment, the plaintiff's evidence must generally rebut the employer's

11

proffered legitimate reasons and allow a factfinder reasonably to infer that "*each* of the employer's proffered nondiscriminatory reasons" was a fabrication or otherwise did not actually prompt the employment action. 32 F.3d at 764 (citation omitted). Although in some circumstances a plaintiff can avoid rebutting every legitimate reason an employer provides, those situations are limited to instances in which the employer's credibility has been seriously undermined or the plaintiff provides evidence of discriminatory intent. *Id.* at 762, 764 n.7. Ball's evidence merely suggests that his performance may not have been as poor as Appellees allege, and it presents no serious challenge to Appellees' credibility. Because such evidence is insufficient to support an inference of pretext, we conclude that the District Court properly granted Appellees' motion for summary judgment.

## III.   Conclusion

For the foregoing reasons, we will affirm the District Court's grant of summary judgment.